UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION, <br><br>                 Plaintiff, <br><br> v. <br><br> DILLON MICHAEL DEAN and THE ENTREPRENEURS HEADQUARTERS LIMITED, <br><br>                 Defendants. | Case Number 18-cv-00345 <br><br> Judge _____ <br><br> ECF Case |

**COMPLAINT FOR INJUNCTIVE AND OTHER EQUITABLE RELIEF, RESTITUTION, AND CIVIL MONETARY PENALTIES UNDER THE COMMODITY EXCHANGE ACT**

Plaintiff, Commodity Futures Trading Commission ("CFTC" or "Commission"), by and through its attorneys, alleges as follows:

## I.     SUMMARY

1.     From approximately April 2017 through the present (the "Relevant Period"), Defendant Dillon Michael Dean ("Dean"), through his company, Defendant The Entrepreneurs Headquarters Limited ("TEH") (together, "Defendants"), has engaged in a fraudulent scheme to solicit at least $1.1 million worth of Bitcoin from more than 600 members of the public to participate in a pooled investment vehicle for trading commodity interests.  Rather than convert customer funds, security, or property ("funds") from Bitcoin to fiat currency to invest in binary options contracts, as promised, Defendants misappropriated their customers' funds (including by using them to pay other customers, in the manner of a Ponzi scheme), and then lied to customers about their account balances in order to conceal Defendants' misappropriation.

2.      In furtherance of the fraudulent scheme, Defendants made material misstatements and omissions in solicitations to pool participants, including misrepresenting Dean's experience and track record, and misrepresenting that forty percent of the customers' funds would be pooled and invested in, among other things, binary options for the customers' benefit, with all or substantially all of the remainder kept in reserve in Bitcoins to fund customer withdrawals.

3.      Upon information and belief, in reality, Defendants did not trade any of the funds contributed by customers for the benefit of the pool.

4.      In order to perpetuate the fraud and conceal their misappropriation, Defendants made misrepresentations to their customers, such as by issuing them electronic account statements (available through TEH's website), which purported to reflect that customers' account balances were being credited with the exorbitant daily returns promised by Defendants and which indicated that such amounts were available for withdrawal by customers.

5.      Defendants also attempted to perpetuate the fraud and conceal their misappropriation of customer funds by lying to customers, beginning in August 2017, about a purported hack of Defendants' website.

6.      During the Relevant Period, TEH also failed to register with the Commission as a commodity pool operator ("CPO"), and Dean failed to register with the Commission as an associated person ("AP") of a CPO.

7.      By virtue of this conduct and the conduct further described herein, Defendants, either directly or as controlling persons, have engaged, are engaging, or are about to engage in acts and practices in violation of Sections 4c(b), 4k(2), 4m(1), and 4$o$(1)(A)-(B) of the Commodity Exchange Act (the "Act"), 7 U.S.C. §§ 6c(b), 6k(2), 6m(1), 6$o$(1)(A)-(B) (2012),

and Commission Regulations ("Regulations") 3.12(a) and 32.4, 17 C.F.R. §§ 3.12(a), 32.4 (2017).

8.      The acts and omissions described herein all have been done during the Relevant Period by Dean and other officers, employees or agents of TEH in the scope of their employment or office at TEH.  Therefore, TEH is liable for all acts and omissions described herein, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2012), and Regulation 1.2, 17 C.F.R. § 1.2 (2017).

9.      Dean was a controlling person of TEH throughout the Relevant Period and did not act in good faith or knowingly induced TEH's violations of the Act and Regulations described herein.  Therefore, Dean is liable for TEH's violations of the Act and Regulations, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2012).

10.      The Commission brings this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2012), to enjoin Defendants' unlawful acts and practices and to compel their compliance with the Act and the Regulations promulgated thereunder.  In addition, the Commission seeks civil monetary penalties, and remedial ancillary relief, including, but not limited to, trading and registration bans, restitution, disgorgement, rescission, pre- and post-judgment interest, and such other and further relief as the Court may deem necessary or appropriate.

11.      Unless restrained and enjoined by this Court, Defendants will likely continue to engage in acts and practices alleged in this Complaint and similar acts and practices, as described below.

## II.     JURISDICTION AND VENUE

12.     Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a) (2012), authorizes the Commission to seek injunctive and other relief in United States district court against any person whenever it shall appear to the Commission that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act, or any rule, regulation, or order thereunder, and provides that district courts "shall have jurisdiction to entertain such actions."  This Court also has jurisdiction pursuant to 28 U.S.C. § 1331 (2012) (Federal Question) and 28 U.S.C. § 1345 (United States as Plaintiff) (2012).

13.     Venue lies properly with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e) (2012), because Defendants transacted business in this District, and certain transactions, acts, practices, and courses of business alleged in this Complaint occurred, are occurring, or are about to occur in this District.

## III.     THE PARTIES

14.     Plaintiff **Commission** is an independent federal regulatory agency charged by Congress with the administration and enforcement of the Act, 7 U.S.C. §§ 1-26 (2012), and the Regulations promulgated thereunder, 17 C.F.R. pt. 1–190 (2017).

15.     Defendant **TEH** is an England and Wales company, incorporated on or about April 24, 2017.  TEH has never been registered with the Commission in any capacity.

16.     Defendant **Dean** is the sole founder, principal, director, and officer of TEH. Dean's last known residence is in Longmont, Colorado.  Dean has never been registered with the Commission in any capacity.

## IV.   FACTS

**A.    Defendants' Purported Commodity Pool**

17.     In or around April 2017, Dean began soliciting investments in a multi-level marketing scheme, which he referred to on his website as "The Entrepreneurs Headquarters," or "TEH" for short.

18.     On his website, www.theentrepreneurheadquarters.com, Dean stated that he was the owner of TEH, claiming that he had "traded options" for seven years, and had "[s]trong skills in options trading," among other areas.

19.     The website offered the opportunity to invest in a pooled investment vehicle referred to as "Option #1":  "Option #1 is a [sic] automated investment where you invest and get a [sic] automatic return in your back office on our set return rate.  Our current set return rate is 11%-17.5%/week depending on how much you invest."  (Options #2 and #3 offered customers assistance in trading through their own personal accounts on the North American Derivatives Exchange ("Nadex"), an online exchange that is designated by the Commission as a contract market for binary options.)

20.     The website represented that Option #1 "investments are unit, or private shares inside The Entrepreneurs Headquarters LTD, you are given a set amount of earning [sic] based on the companies [sic] increase in profits and value."

21.     Specifically, the website stated that customers choosing Option #1 "will make money off of the profits we make on the investment via trading options and paid ad promotion. You will be paid weekly and can withdraw profits instantly."

22.     According to the website, the scheme was "extremely sustainable," because Dean had "developed a formula based around a foundation of 3 years of proven trading and paid marketing profit results."

23.     The website promised that participants could earn commissions for referring new customers, stating that the firm's "three-tier referral program" enabled participants to "earn extra money in the amount of 6%-3%-1% of the deposits of your referrals," that participants could make "up to 9% in referral commissions EACH time your referral makes a deposit," that participants need not invest their own funds to earn commissions for referring others, and that participants could solicit new participants with "whatever marketing material" they wished.

24.     Dean marketed the TEH commodity pool by, among other things, uploading a video of himself to YouTube on April 17, 2017.  In the video, Dean identified himself as the CEO and owner of "The Entrepreneur Headquarters," and provided www.theenterpreneurheadquarters.com as the company's website.  Dean stated in the video that he had "launched the business" and that as of "April 15, 2017, our automated [i.e., Option #1] and interactive investments are fully functional and ready to go."

25.     Dean stated in the video that he had already received $6,000 in investments and claimed that he had already achieved over ten percent in returns on that principal.  Dean predicted:  "People are gonna start coming in once they see these results happen, which, they're happening."

26.     Dean also stated in the video:  "Basically what I do is I leave in at least sixty percent of the money for reserve and for people to withdraw, etc., etc., and I use forty percent of the money to profit off of.  And we're doing well.  Basically we do—like I said, we're trading."

27.     In some cases, Dean solicited investments through personal contact with potential investors.  One individual who ultimately invested more than $50,000 with Defendants ("Customer 1") spoke on the telephone with Dean before investing.

28.     Dean told Customer 1 on this phone call that returns for customers would be generated by Dean trading commodity options on Nadex.

29.     Nadex is designated by the CFTC as a contract market, and offers customers the ability to trade binary options.  A binary option is a type of options contract in which the payout depends entirely on the outcome of a yes/no proposition, typically relating to whether the price of a particular asset that underlies the binary option will rise above or fall below a specified amount.  Unlike other types of options, a binary option does not give the holder the right to purchase or sell the underlying asset.  When the binary option expires, the option holder will receive either a pre-determined amount of cash or nothing at all.

30.     Dean also solicited investments in TEH through a closed Facebook group, called "The Entrepreneurs Headquarters," which he created on or about March 31, 2017 (the "Facebook Group").

31.     Dean, through Facebook profiles with the names "Dean Dillon" and "Dillon M. Dean," used the Facebook Group, as well as a smaller Facebook group for a "VIP plan" called "TEH Managed Accounts," to solicit investments in the TEH commodity pool and communicate with participants.  Over 2,000 Facebook users ultimately became members of the Facebook Group.

32.     Dean added other "administrators" to the Facebook Group, beginning with a Kentucky resident who had worked with Dean on a previous multi-level marketing scheme in or around 2014 ("Administrator 1"), and who was identified as the "Marketing Director" for TEH.

33.     Administrator 1 had no trading experience or understanding of commodity options trading, and did not invest any of his own funds in TEH, but solicited over forty customers who did invest.

34.     Dean told Administrator 1 that returns for customers would be generated by Dean trading commodity options on Nadex on behalf of customers, and Administrator 1 conveyed this message to potential customers when soliciting them to invest.

35.     Additional administrators of the Facebook Group were added by Administrator 1 and others.

36.     Administrators posted messages to the Facebook Group, controlled membership in the group, and participated in online streaming videoconferences accessible from the group page.

37.     During these videoconferences, administrators told customers that returns would be generated by Dean trading commodity options on Nadex on behalf of customers.

38.     Dean and other administrators also told customers that, in addition to Dean himself, a person using the name Propht Taurai Moyo on Facebook ("Moyo") was also trading on behalf of TEH customers.

39.     Upon information and belief, all of these representations by Defendants about their trading expertise and intention to generate profits for customers by trading binary options were knowingly false when made.

40.     Defendants were not trading commodity options on Nadex at all during the Relevant Period.

41.     Neither TEH nor Moyo ever had a trading account at Nadex.

42.     Dean had a personal trading account at Nadex that he opened in 2013.  Other than a period of 10 days in February 2017 (i.e., prior to the Relevant Period)—in which Dean *lost* $637.50 trading binary options on forex contracts—there was never any trading activity in the account.

**B.    Defendants' Purported Trading Profits**

43.     Defendants also made numerous representations to customers about their supposed trading profits.

44.     For instance, on July 9, 2017, Dean posted a Facebook message to TEH Managed Accounts purporting to disclose trading "results [for] the last few weeks" of that program, boasting of "a few awesome weeks" and promising to "get even better."  Included in the post was an image promoting weekly profits of 28.50%, 15.25%, and 19.50% for the first three weeks of the "TEH Managed Account" program, respectively; instructing customers to "Email for withdraw @ stockgains9@gmail.com"; and stating, "All money month withdrawn [sic] is compounded weekly."

45.     On July 15, 2017, Dean posted a Facebook message to TEH Managed Accounts, stating:  "17.6% this week. (for members) Was a good week but was really busy and was not able to trade as much as usual.  Next week I got my sights set on 30%."  Included in the post was a purported "screenshot" showing trading from "last week," consisting of an image showing certain details (mostly illegible)—including order number, time, type (buy/sell), product (e.g., "BrentCrude")—of twenty-five purported trades.

46.     On July 23, 2017, Dean posted a Facebook message to TEH Managed Accounts, stating:  "15% last week.  Also waiting to close more trades from last week that will be added to this %.  $$$$$."

47.    On July 29, 2017, Dean posted a Facebook message to TEH Managed Accounts, stating:  "Waiting on a huge trade on OIL.  This week will be recorded next week after oil and a few other trades are closed.  This week will be just like the previous time we had to wait on trades to close.  Thanks!  Patience = money."  The post included an image containing an unlabeled graphic that was illegible except for the handwritten phrase "massive profit."

48.    On August 8, Dean posted to the Facebook Group an image showing purported profitable results trading forex and crude oil derivatives on that date, along with the message "Just keep pumping away . . . with Propht Taurai Moyo."

49.    On August 13, Dean posted a Facebook message to TEH Managed Accounts, purporting to provide "the managed account weekly results for the past 8 weeks."  Dean's message reiterated the percentages provided in his July 9, 15, and 23 messages for Week 1 through Week 5, and represented that total profits for "Week 6-8 (3 weeks)" were "41.25%."

50.    On August 20, Dean posted a Facebook message to TEH Managed Accounts, stating:  "11% this week… slow week trying to get our site back up and running."

51.    Upon information and belief, all of these purported trading profits were entirely fictitious, as Defendants were not actually engaged in trading on behalf of their customers during the Relevant Period.

**C.**    **Solicitation and Transfer of Customer Funds in Bitcoin**

52.    As explained on Defendants' website, Defendants only accepted investor deposits in Bitcoin.

53.    Defendants instructed customers to set up personal account pages at the TEH website (referred to by Defendants and customers as their "back office") and follow the instructions there to transfer Bitcoin to TEH from the customers' own cryptocurrency wallets.

54.     For instance, one customer who began investing with TEH in June 2017 ("Customer 2") was prompted by the TEH website to select one of three investment options (which varied by amount required to be invested, length of time of the investment, and promised rate of return).

55.     After Customer 2 selected the "Weekly VIP Plan," the TEH website provided him with an alphanumeric string to which to direct his payment of Bitcoin.

56.     Customer 2 then logged into his own Bitcoin wallet at Coinbase and directed Bitcoin to be paid from his wallet to the alphanumeric string provided by the TEH website.

57.     Customer 2 later received a confirmation email from CoinPayments.net, a cryptocurrency payment processor used by TEH, stating that he had successfully directed payment of Bitcoins to "The Entrepreneurs Headquarters."

58.     After customers such as Customer 2 transferred Bitcoin to TEH through CoinPayments.net and the payments were confirmed, they could log into their back office and see their account balance with TEH, denominated in U.S. dollars.

59.     For a period of time, Defendants made upwards adjustments to customers' back office U.S. dollar account balances on a regular basis, reflecting the high rates of return ("11%-17.5%" per week, or comparable daily rates) promised on Defendants' website.

60.     As promised on the TEH website ("Profits can be withdrawn at anytime [sic]"), customers were initially able to withdraw the interest on their principal investments by logging into their back office and requesting the transfer of Bitcoin (corresponding to the U.S. dollar amounts shown in their back office) from TEH to the customers' Bitcoin wallets.

61.     Between approximately April 2017 and August 2017, many customers made successful withdrawals of Bitcoin from their accounts.

**D.**   **Defendants' Invention of a Hacking Incident in Order To Perpetuate Their Fraud**

62.    On August 9, 2017, a TEH customer whom Dean had added as an administrator of the Facebook Group on or about June 6, 2017 ("Administrator 2"), posted, while located in this District, a message to the Facebook Group that stated:

> URGENT MESSAGE..IT HAS BEEN BROUGHT TO OUR
> ATTENTION THAT SOME HAVE HAD THERE [sic]
> ACCOUNT HACKED AND WALLET CHANGED…ASAP GO
> CHANGE YOUR WALLET ADDRESS AND SAVE PLUS
> ENABLE ALL SECURITY[.]  IF YOU HAVE A PENDING
> WITHDRAW [sic] DOUBLE CHECK THE ADDRESS IT'S
> GOING TOO!!! [sic]  AND CHANGE YOUR EXSISTING [sic]
> PASSWORD AS WELL!!!!!"

63.    Later on August 9, Dean posted a message to the Facebook Group, stating: "CRAZY I detected a hacker, but everything is ok, and I have stopped who ever it was.  I have hared [sic] that some accounts got hacked, if they did, message me and I can fix the issue.  If you need to send me a message, send a fried [sic] request first if your [sic] not friends so the message goes to my primary inbox."

64.    Upon information and belief, there had been no hack of the TEH website, and Defendants knew, or recklessly disregarded the fact, that at the time they made each of these statements about the supposed hack the statements were false.

65.    Upon information and belief, the statements about the supposed hack were made by Defendants with the intent to deceive customers and conceal and perpetuate Defendants' fraud.

66.    On August 11, Dean posted a message to the Facebook Group identifying a "[s]uspicious email address" and stating:  "Do not respond to any emails from this guy . . . got to say the hacker is really trying his hardest lol."

67.     Later on August 11, Dean posted another message to the Facebook Group, stating: "Hacker is holding site for ransom LOL Do not touch the site I got an email titled 'i hacked you' and requesting reply and most likly [sic] funds for him to release back to me."

68.     Upon information and belief, Dean knew that the person with the supposedly suspicious email address had not hacked the TEH website, and that no one was holding the site "for ransom."

69.     Dean's message continued:  "Good thing I already have new site made!  Just am finishing the back end and with programmers now to speed up the process."  Dean provided a website address—http://dutysquad.com/demo/teh/index.php (the "preview website")—which, he wrote, "is what the new site will look like!"  In fact, this "new" preview website had been online since at least May 2017, and it contained substantially the same material as the purportedly hacked TEH website.

70.     Dean's message concluded by promising to provide "further instructions on how we will transfer to this site" and instructing customers to email him at stockgains9@gmail.com if they wished to make "any emergency withdraws [sic]" of funds.

71.     On August 13, Dean posted another message to the Facebook Group, stating: "Soon I will be collecting everyone's deposit amount and adding it to the new site when the programmer has it ready.  Just finishing the new back end."

72.     Later on August 13, Dean posted another message, stating that Defendants were "[w]orking hard on finishing the back end" of TEH's new website "so we can start the transfer."

73.     Dean's message continued:  "Money is safe and there are no problems."  He concluded:  "Apologize if I have not got to your message yet as I have 100s to go through."

74.     On August 14, Dean posted a message to the Facebook Group, claiming to have "processed over 100 emergency withdraws now," and asking customers to "please only do one if you really need it . . . the new site will be out soon."

75.     On August 17, Dean posted a message to the Facebook Group, stating: "All the data has been lost because of the hacker," and providing the following instructions to customers: "1) Send screenshots of your initial deposits into TEH from your wallet.  2) Send screenshots of all your withdraws made.  3) Send all screenshots here; --------→ transfertonewsite@gmail.com."

76.     Defendants then proceeded to post a series of "Updates" to the preview website, which updates were, upon information and belief, merely an attempt to continue to conceal their fraud by fabricating purported reasons for customers to delay taking action with respect to their investments.

77.     Defendants claimed on the preview website that as of August 19, 2017, they were "currently in the process of building the new site," and that, as of August 21, the "completion of the TEH back end will be 8/22/2017 (tomorrow)," stating: "The time estimation of creating each account accordingly is 2-3 days.  After that the site will be ready and open for business."

78.     On August 21, Defendants posted a message to the preview website claiming that they were "[c]ompleting the payment software needed to do the payments."

79.     On August 23, Defendants posted a message to the preview website claiming that they were "[w]orking as fast has [sic] we can so we can start the adding everyone accounts [sic]" as well as "working on editing and re-doing the content of the site."  The message stated that the "re-opening of the site will be between 8/26/2017-8/28/2017," i.e., within the next three to five days, "if everything goes according to plan."

80.     On September 2, Dean posted a message to the Facebook Group, stating that Defendants "will first find out what your active balance was before the site sent [sic] down." Dean promised that "[t]o cover the loss" from the time the original TEH website was down (and Defendants "were not able to trade as much"), "we will send you 18% of you active deposit PLUS adding the active deposit back onto a fresh new plan which will extend your earning days of the time we were down [sic]."

81.     In or around early September 2017, customers who had provided their information pursuant to Dean's August 17 instructions received emails from TEH using the address transfertonewsite@gmail.com, which purported to have credited the customers with their "active balance" plus eighteen percent because "[d]uring our down period, we were only trading about half the time due to site maintenance."  The emails stated that TEH's new website "is not fully active" but promised to provide a link to the website "soon."

### E.     Defendants' Misappropriation and Refusal To Return Customers' Funds

82.     As Defendants attempted to delay, customers began to post messages to the Facebook Group that were critical of TEH and Dean, questioning the validity of their representations and promises.

83.     In response, Dean and other administrators removed such customers from the group, and ultimately Defendants moved their activity to a new closed Facebook group, called "Official Entrepreneurs Headquarters Group" (the "Official' Facebook Group").

84.     Ultimately, when Defendants provided the URL to TEH's new website, located at entrepreneursheadquarter.com, it contained substantially the same information as had already existed for months both on the original TEH website (theentrepreneurheadquarters.com) and the preview website.

85.     However, the extravagant daily and weekly returns promised to customers were reduced to almost zero.  Defendants offered no justification why their purported trading lost profitability so precipitously.

86.     In response to customers' requests for the return of their principal investments or purported earnings or fees that Defendants had represented to have been credited to their accounts, Defendants continued to make up excuses for their failure to pay redemptions.

87.     For instance, on December 9, 2017, Dean posted a message on the "Official" Facebook Group, stating:  "Withdraws; SLOWWW blockchain…btc was losing it there for a while lol I am waiting on a few large transactions to be moved over into our BTC wallet for the mass payment for everyone's withdraws."

88.     In recent weeks, when customers asked Defendants for the return of their funds, their requests were ignored.

89.     Dean has stopped responding to emails and other communications from customers who have previously asked for the return of their funds.

90.     Upon information and belief, Defendants have stopped making payments to customers of TEH, and have misappropriated over $1 million total in principal investments by customers.

91.     Meanwhile, Dean and other representatives of TEH have launched another purported trading venture, Real Trade Profits ("RTP"), which solicits new customers in a manner very similar to TEH—seeking investments in Bitcoin for a pooled investment, professing expertise and consistent results in binary options trading, and promising high rates of return—using the website realtradeprofits.com.

16

92.     According to its website, RTP is a "small group of self-taught traders who have developed two successful and unique trading techniques," who are "Experts on the Binary Options and Forex Platforms."

93.     The RTP website states:  "We have a [sic] automated payment platform that will automatically pay interest on all of your deposits into RTP.  Simply deposit and earn 20%-50% of all the profits we make that day which averages 1-10% return on your money everyday [sic] of the week . . . .  Your principal is returned to you at the end of the pay period, and you are able to withdraw all profits as well."  The website offers 14-day, 30-day, and 45-day "Interest Plans."

94.     As of December 4, 2017, RTP purported to have 65 members.

## V.     VIOLATIONS OF THE COMMODITY EXCHANGE ACT AND COMMISSION REGULATIONS

### COUNT ONE

### Violations of Section 4c(b) and Regulation 32.4 (Options Fraud)

95.     Paragraphs 1 through 94 are realleged and incorporated herein by reference.

96.     Section 4c(b) of the Act, 7 U.S.C. § 6c(b) (2012), makes it unlawful for any person to offer to enter into, enter into, or confirm the execution of, any transaction involving any commodity regulated under the Act which is of the character of, or is commonly known to the trade as, inter alia, an "option", "bid", "offer", "put", or "call", contrary to any rule, regulation, or order of the Commission prohibiting any such transaction or allowing any such transaction under such terms and conditions as the Commission shall prescribe.

97.     Regulation 32.4, 17 C.F.R. § 32.4 (2017), provides that, in or in connection with an offer to enter into, the entry into, or the confirmation of the execution of, any commodity option transaction, it shall be unlawful for any person, directly or indirectly:  (a) to cheat or defraud or attempt to cheat or defraud any other person; (b) to make or cause to be made to any

other person any false report or statement thereof or cause to be entered for any person any false record thereof; or (c) to deceive or attempt to deceive any other person by any means whatsoever.

98.     Defendants violated Section 4c(b) of the Act and Regulation 32.4, by, as alleged above, cheating and defrauding, or attempting to cheat and defraud, customers, in connection with Defendants' offers to enter into commodity option contracts.  Defendants misrepresented that they would trade binary options on Nadex and that customers would achieve returns of 11%-17.5% per week.  Defendants also misappropriated customer funds and never traded options with TEH customer funds.  Moreover, Defendants failed to disclose the high degree of risk associated with options trading and that it was possible to sustain a total loss of investment.  Defendants also concealed and perpetuated their fraud by falsely stating that their website was hacked.

99.     The foregoing acts, omissions, and failures by Dean and other officers, employees, and agents of TEH occurred within the scope of their employment or office with TEH.  Therefore, TEH is liable for its officers, employees, and agents' acts, omissions, and failures in violation of Section 4c(b) of the Act and Regulation 32.4, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2012), and Regulation 1.2, 17 C.F.R. § 1.2 (2017).

100.     Dean held and exercised direct and indirect control over TEH and either did not act in good faith or knowingly induced TEH's violations of Section 4c(b) of the Act and Regulation 32.4.  As a controlling person of TEH, Dean is liable for TEH's violations of Section 4c(b) of the Act and Regulation 32.4, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2012).

101.     Each misrepresentation, omission of material fact, false statement, and misappropriation, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Section 4c(b) of the Act and Regulation 32.4.

## COUNT TWO

### Violations of Section 4*o*(1)(A)-(B)
(CPO Fraud)

102.     Paragraphs 1 through 101 are realleged and incorporated herein by reference.

103.     During the Relevant Period, TEH acted as a CPO, as defined by Section 1a(11) of the Act, 7 U.S.C. § 1a(11) (2012), in that it engaged in a business that is of the nature of an investment trust, syndicate, or similar form of enterprise, operated for the purpose of trading in commodity interests and, in connection therewith, solicited, accepted, or received from others, funds, securities, or property (in the form of Bitcoins), either directly or through capital contributions, the sale of stock or other forms of securities, or otherwise, for the purpose of trading in commodity interests, including, in relevant part, commodity options authorized under Section 4c of the Act.

104.     An AP of a CPO is defined by Regulation 1.3(aa)(3), 17 C.F.R. § 1.3(aa)(3) (2017), as any person who is associated with a CPO as a partner, officer, employee, consultant, or agent (or any natural person occupying a similar status or performing similar functions), in any capacity which involves (i) the solicitation of funds, securities, or property for a participation in a commodity pool or (ii) the supervision of any person or persons so engaged.  During the Relevant Period, Dean acted as an AP of TEH, in that he solicited funds, securities, or property (in the form of Bitcoins) for TEH's pool and supervised other officers, employees, and agents of TEH who solicited funds, securities, or property for TEH's pool.

105.    Section 4*o*(1) of the Act, 7 U.S.C. § 6*o*(1) (2012), prohibits CPOs and APs of CPOs, whether registered with the Commission or not, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly, from employing devices, schemes, or artifices to defraud any client or participant or prospective client or participant, or engaging in transactions, practices, or courses of business which operate as a fraud or deceit upon any client or participant or prospective client or participant.

106.    While acting in its capacity as a CPO, TEH, by and through its officers, employees, and agents, knowingly or recklessly:  (1) misrepresented to customers that approximately forty percent of their funds would be pooled and used to invest in, among other things, commodity options contracts for the benefit of customers; (2) misrepresented to customers that Defendants had prior experience and success trading commodity options on Nadex; (3) misrepresented to customers that Defendants were using their funds to trade commodity options on Nadex and were doing so profitably; (4) mispresented to customers that Defendants were holding approximately sixty percent of their funds in reserve in order to facilitate withdrawals; (5) misrepresented to customers that the hacking of TEH's website and related issues were preventing Defendants from making customer funds available to customers; and (6) misappropriated pool participants' funds for unauthorized purposes rather than investing for the benefit of participants, and failed to disclose that pool participants' funds had been misappropriated.  Therefore, TEH violated Section 4*o*(1) of the Act.

107.    Dean directly violated Section 4*o*(1) of the Act while acting in his capacity as an AP of TEH, because he knowingly or recklessly:  (1) misrepresented to customers that approximately forty percent of their funds would be pooled and used to invest in, among other things, commodity options contracts for the benefit of customers; (2) misrepresented to

customers that Defendants had prior experience and success trading commodity options on Nadex; (3) misrepresented to customers that Defendants were using their funds to trade commodity options on Nadex and were doing so profitably; (4) mispresented to customers that Defendants were holding approximately sixty percent of their funds in reserve in order to facilitate withdrawals; (5) misrepresented to customers that the hacking of TEH's website and related issues were preventing Defendants from making customer funds available to customers; and (6) misappropriated pool participants' funds for unauthorized purposes rather than investing for the benefit of participants, and failed to disclose that pool participants' funds had been misappropriated.

108. The foregoing acts, omissions, and failures by Dean and other officers, employees, and agents of TEH occurred within the scope of their employment or office with TEH. Therefore, TEH is liable for its officers, employees, and agents' acts, omissions, and failures in violation of Section 4$o$(1) of the Act, pursuant to Section 2(a)(1)(B) of the Act and Regulation 1.2.

109. Dean held and exercised direct and indirect control over TEH and either did not act in good faith or knowingly induced TEH's violations of Section 4$o$(1) of the Act. As a controlling person of TEH, Dean is liable for TEH's violations of Section 4$o$(1) of the Act, pursuant to Section 13(b) of the Act.

110. Each misrepresentation, omission of material fact, false statement, and misappropriation, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Section 4$o$(1) of the Act.

## COUNT THREE

### Violations of Section 4m(1) and 4k(2) of the Act and Regulation 3.12(a)
### (Failure to Register as a CPO and as an AP of the CPO)

111.    Paragraphs 1 through 110 are realleged and incorporated herein by reference.

112.    During the Relevant Period, TEH, while using the mails or means of interstate commerce in connection with its business as a CPO, was not registered with the Commission as a CPO and was not exempt from registration as a CPO.  Thus, TEH acted as an unregistered CPO in violation of Section 4m(1) of the Act, 7 U.S.C. § 6m(1) (2012).

113.    During the Relevant Period, Dean, while acting as an AP of TEH, was never registered as an AP of TEH.  Thus, Dean violated Section 4k(2) of the Act, 7 U.S.C. § 6k(2) (2012), and Regulation 3.12(a), 17 C.F.R. § 3.12(a) (2017), by acting as an unregistered AP of a CPO.

114.    Dean held and exercised direct and indirect control over TEH and either did not act in good faith or knowingly induced TEH's violations of Section 4m(1) of the Act.  As a controlling person of TEH, Dean is liable for TEH's violations of Section 4m(1) of the Act, pursuant to Section 13(b) of the Act.

## VI.    RELIEF REQUESTED

WHEREFORE, the Commission respectfully requests that this Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-1 (2012), and pursuant to its own equitable powers:

A.    Enter an order finding that Defendants violated Sections 4c(b), 4k(2), 4m(1), and 4o(1)(A)-(B) of the Act, 7 U.S.C. §§ 6c(b), 6k(2), 6m(1), 6o(1)(A)-(B) (2012), and Regulations 3.12(a) and 32.4, 17 C.F.R. §§ 3.12(a), 32.4 (2017);

B.    Enter an order of permanent injunction restraining, enjoining, and prohibiting Defendants and any other person or entity in active concert with them from engaging in conduct

in violation of Sections 4c(b), 4k(2), 4m(1), and 4o(1)(A)-(B) of the Act, and Regulations 3.12(a) and 32.4;

   C. Enter an order of permanent injunction prohibiting Defendants and any other person or entity in active concert with them from, directly or indirectly:

    1) Trading on or subject to the rules of any registered entity (as that term is defined by Section 1a(40) of the Act, 7 U.S.C. § 1a(40) (2012));

    2) Entering into any transactions involving "commodity interests" (as that term is defined in Regulation 1.3(yy), 17 C.F.R. § 1.3(yy) (2017)), for accounts held in the name of any Defendant or for accounts in which any Defendant has a direct or indirect interest;

    3) Having any commodity interests traded on any Defendant's behalf;

    4) Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests;

    5) Soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling of any commodity interests;

    6) Applying for registration or claiming exemption from registration with the CFTC in any capacity, and engaging in any activity requiring such registration or exemption from registration with the CFTC except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2017); and

    7) Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2017)), agent, or any other officer or employee of any person

registered, exempted from registration, or required to be registered with the

CFTC except as provided for in Regulation 4.14(a)(9);

D.      Enter an order requiring Defendants, as well as any of their successors, to

disgorge to any officer appointed by the Court all benefits received from acts or practices that

constitute violations of the Act and Regulations as described herein, including, but not limited to,

salaries, commissions, loans, fees, revenues, and trading profits derived, directly or indirectly,

plus pre-judgment interest thereon from the date of such violations, plus post-judgment interest;

E.      Enter an order requiring Defendants, as well as any of their successors, to make

full restitution, pursuant to such procedure as the Court may order, to every person or entity who

sustained losses proximately caused by Defendants' violations (in the amount of such losses), as

described herein, plus pre-judgment interest thereon from the date of such violations, plus post-

judgment interest;

F.      Enter an order directing Defendants, as well as any of their successors, to rescind,

pursuant to such procedures as the Court may order, all contracts and agreements, whether

implied or express, entered into between them and any of the customers whose funds were

received by them as a result of the acts and practices which constituted violations of the Act and

Regulations, as described herein;

G.      Enter an order directing each Defendant to pay a civil monetary penalty, to be

assessed by the Court, in an amount not to exceed the penalty prescribed by Section 6c(d)(1) of

the Act, 7 U.S.C. § 13a-1(d)(1) (2012), as adjusted for inflation pursuant to the Federal Civil

Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. 114-74, 129 Stat. 584

(2015), title VII, Section 701, *see* Regulation 143.8, 17 C.F.R. § 143.8 (2017), for each violation

of the Act and Regulations, as described herein;

H.      Enter an order directing that Defendants, as well as any of their successors, make

an accounting to the Court of all of their assets and liabilities, together with all funds they

received from and paid to investors and other persons in connection with commodity interests

and all disbursements for any purpose whatsoever of funds received from commodity interests,

including salaries, commissions, interest, fees, loans, and other disbursement of money or

property of any kind from at least April 2017 to the date of such accounting;

I.      Enter an order requiring Defendants to pay costs and fees as permitted by

28 U.S.C. §§ 1920 and 2413(a)(2) (2012); and

J.      Enter an order providing such other and further relief as this Court may deem

necessary and appropriate under the circumstances.


January 18, 2018                                    Respectfully submitted,

                                                    COMMODITY FUTURES TRADING
                                                    COMMISSION

                                            By: s/ David C. Newman_____
                                                    David C. Newman
                                                    Senior Trial Attorney
                                                    dnewman@cftc.gov
                                                    (646) 746-9740

                                                    W. Derek Shakabpa, *pro hac vice pending*
                                                    Senior Trial Attorney
                                                    wshakabpa@cftc.gov

                                                    David W. MacGregor, *pro hac vice pending*
                                                    Chief Trial Attorney
                                                    dmacgregor@cftc.gov

                                                    Manal M. Sultan
                                                    Deputy Director
                                                    msultan@cftc.gov

Commodity Futures Trading Commission
Division of Enforcement
140 Broadway, 19th floor
New York, NY 10005
Phone: (646) 746-9700
Fax: (646) 746-9940

ATTORNEYS FOR PLAINTIFF
COMMODITY FUTURES TRADING
COMMISSION