COURTESY COPY

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

F I L E D
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★   JUL 09 2018   ★

COMMODITY FUTURES TRADING
COMMISSION,

LONG ISLAND OFFICE

Plaintiff,

Case Number 18-cv-00345-SJF-AYS

v.

(SJF/pık)
[PROPOSED] ORDER
AND DEFAULT JUDGMENT

DILLON MICHAEL DEAN and THE
ENTREPRENEURS HEADQUARTERS
LIMITED,

Defendants.

## I.    INTRODUCTION

This matter is before the Court upon Plaintiff Commodity Futures Trading Commission's

Motion for Default Judgment ("Motion") pursuant to Rule 55(b)(2) of the Federal Rules of Civil

Procedure ("FRCP") and Rule 55.2(b) of the Local Rules of the United States District Courts for

the Southern and Eastern Districts of New York ("Local Rules").

On January 18, 2018, Plaintiff Commodity Futures Trading Commission ("Plaintiff" or

the "Commission") filed its Complaint for Injunctive and Other Equitable Relief, Restitution,

and Civil Monetary Penalties under the Commodity Exchange Act (the "Complaint" or

"Compl.") against Dillon Michael Dean ("Dean") and The Entrepreneurs Headquarters Limited

("TEH") (collectively, "Defendants"). (ECF No. 1.) On April 9, 2018, the Commission filed

proof of service of the summons and Complaint on Dean. (ECF No. 14.) On May 2, 2018, the

Commission filed proof of service of the summons and Complaint on TEH, which service,

pursuant to New York Limited Liability Company Law § 304(e), was complete on May 12,

2018. (ECF No. 15.) Defendants failed to answer or otherwise move with respect to the

Complaint, and the Clerk of Court entered Dean's default on May 8, 2018, and entered TEH's

1

default on June 14, 2018.  (ECF Nos. 18, 21.)  Pursuant to the Court's May 10, 2018 Order, Plaintiff filed its Motion on June 21, 2018, and a hearing on the Motion was held on July 9, 2018.

Upon the Commission's Motion, and having carefully considered the Complaint (the allegations of which are well-pleaded and hereby taken as true), the Motion, and other written submissions filed with the Court, and being fully advised in the premises, pursuant to FRCP 55(b)(2) and Local Rule 55.2(b), it is hereby **ORDERED AND ADJUDGED** that:

Plaintiff's Motion be and the same is hereby **GRANTED**; and

Pursuant to FRCP 55 and 58, Default Judgment be and the same is hereby **ENTERED** in favor of Plaintiff and against Defendants Dean and TEH.

Accordingly, the Court enters the following findings of fact and conclusions of law and orders the following relief:

## II.     FINDINGS OF FACT

### A.     The Parties

1.     Plaintiff Commission is an independent federal regulatory agency charged by Congress with the administration and enforcement of the Commodity Exchange Act (the "Act" or "CEA"), 7 U.S.C. §§ 1-26 (2012), and the Commission Regulations ("Regulations") promulgated thereunder, 17 C.F.R. pt. 1–190 (2018).  (Compl. ¶ 14.)

2.     Defendant TEH is an England and Wales company, incorporated on or about April 24, 2017.  TEH has never been registered with the Commission in any capacity.  (Compl. ¶ 15.)

3.     Defendant Dean is the sole founder of TEH and, from April 2017 through January 18, 2018 (the "Relevant Period"), was the sole principal, director, and officer of TEH.  Dean's

last known residence is in Longmont, Colorado.  Dean has never been registered with the Commission in any capacity.  (Compl. ¶ 16.)

**B.      Defendants' Purported Commodity Pool**

4.      In or around April 2017, Dean began soliciting investments in a multi-level marketing scheme, which he referred to on his website as "The Entrepreneurs Headquarters," or "TEH" for short.  (Compl. ¶ 17.)

5.      On his website, www.theentrepreneurheadquarters.com, Dean stated that he was the owner of TEH, claiming that he had "traded options" for seven years, and had "[s]trong skills in options trading," among other areas.  (Compl. ¶ 18.)

6.      The website offered the opportunity to invest in a pooled investment vehicle referred to as "Option #1": "Option #1 is a [sic] automated investment where you invest and get a [sic] automatic return in your back office on our set return rate.  Our current set return rate is 11%-17.5%/week depending on how much you invest."  (Options #2 and #3 offered customers assistance in trading through their own personal accounts on the North American Derivatives Exchange ("Nadex"), an online exchange that is designated by the Commission as a contract market for binary options.)  (Compl. ¶ 19.)

7.      The website represented that Option #1 "investments are unit, or private shares inside The Entrepreneurs Headquarters LTD, you are given a set amount of earning [sic] based on the companies [sic] increase in profits and value."  (Compl. ¶ 20.)

8.      Specifically, the website stated that customers choosing Option #1 "will make money off of the profits we make on the investment via trading options and paid ad promotion.  You will be paid weekly and can withdraw profits instantly."  (Compl. ¶ 21.)

3

9.      According to the website, the scheme was "extremely sustainable," because Dean

had "developed a formula based around a foundation of 3 years of proven trading and paid

marketing profit results." (Compl. ¶ 22.)

10.     The website promised that participants could earn commissions for referring new

customers, stating that the firm's "three-tier referral program" enabled participants to "earn extra

money in the amount of 6%-3%-1% of the deposits of your referrals," that participants could

make "up to 9% in referral commissions EACH time your referral makes a deposit," that

participants need not invest their own funds to earn commissions for referring others, and that

participants could solicit new participants with "whatever marketing material" they wished.

(Compl. ¶ 23.)

11.     Dean marketed the TEH commodity pool by, among other things, uploading a

video of himself to YouTube on April 17, 2017.  In the video, Dean identified himself as the

CEO and owner of "The Entrepreneur Headquarters," and provided

www.theenterpreneurheadquarters.com as the company's website.  Dean stated in the video that

he had "launched the business" and that as of "April 15, 2017, our automated [i.e., Option #1]

and interactive investments are fully functional and ready to go." (Compl. ¶ 24.)

12.     Dean stated in the video that he had already received $6,000 in investments and

claimed that he had already achieved over ten percent in returns on that principal.  Dean

predicted: "People are gonna start coming in once they see these results happen, which, they're

happening." (Compl. ¶ 25.)

13.     Dean also stated in the video: "Basically what I do is I leave in at least sixty

percent of the money for reserve and for people to withdraw, etc., etc., and I use forty percent of

the money to profit off of.  And we're doing well.  Basically we do—like I said, we're trading."
(Compl. ¶ 26.)

14.     In some cases, Dean solicited investments through personal contact with potential
investors.  One individual who ultimately invested more than $50,000 with Defendants
("Customer 1") spoke on the telephone with Dean before investing.  (Compl. ¶ 27.)

15.     Dean told Customer 1 on this phone call that returns for customers would be
generated by Dean trading commodity options on Nadex.  (Compl. ¶ 28.)

16.     Nadex is designated by the Commission as a contract market, and offers
customers the ability to trade binary options.  A binary option is a type of options contract in
which the payout depends entirely on the outcome of a yes/no proposition, typically relating to
whether the price of a particular asset that underlies the binary option will rise above or fall
below a specified amount.  Unlike other types of options, a binary option does not give the
holder the right to purchase or sell the underlying asset.  When the binary option expires, the
option holder will receive either a pre-determined amount of cash or nothing at all. (Compl.
¶ 29.)

17.     Dean also solicited investments in TEH through a closed Facebook group, called
"The Entrepreneurs Headquarters," which he created on or about March 31, 2017 (the "Facebook
Group").  (Compl. ¶ 30.)

18.     Dean, through Facebook profiles with the names "Dean Dillon" and "Dillon M.
Dean," used the Facebook Group, as well as a smaller Facebook group for a "VIP plan" called
"TEH Managed Accounts," to solicit investments in the TEH commodity pool and to
communicate with participants.  Over 2,000 Facebook users ultimately became members of the
Facebook Group.  (Compl. ¶ 31.)

19.     Dean added other "administrators" to the Facebook Group, beginning with a Kentucky resident who had worked with Dean on a previous multi-level marketing scheme in or around 2014 ("Administrator 1"), and who was identified as the "Marketing Director" for TEH. (Compl. ¶ 32.)

20.     Administrator 1 had no trading experience or understanding of commodity options trading, and did not invest any of his own funds in TEH, but solicited over forty customers who did invest.  (Compl. ¶ 33.)

21.     Dean told Administrator 1 that returns for customers would be generated by Dean trading commodity options on Nadex on behalf of customers, and Administrator 1 conveyed this message to potential customers when soliciting them to invest.  (Compl. ¶ 34.)

22.     Additional administrators of the Facebook Group were added by Administrator 1 and others.  (Compl. ¶ 35.)

23.     Administrators posted messages to the Facebook Group, controlled membership in the group, and participated in online streaming videoconferences accessible from the group page.  (Compl. ¶ 36.)

24.     During these videoconferences, administrators told customers that returns would be generated by Dean trading commodity options on Nadex on behalf of customers.  (Compl. ¶ 37.)

25.     Dean and other administrators also told customers that, in addition to Dean himself, a person using the name Propht Taurai Moyo on Facebook ("Moyo") was also trading on behalf of TEH customers.  (Compl. ¶ 38.)

6

26.     All of these representations by Defendants about their trading expertise and intention to generate profits for customers by trading binary options were knowingly false when made. (Compl. ¶ 39.)

27.     Defendants were not trading commodity options on Nadex at any time during the Relevant Period. (Compl. ¶ 40.)

28.     Neither TEH nor Moyo ever had a trading account at Nadex. (Compl. ¶ 41.)

29.     Dean had a personal trading account at Nadex that he opened in 2013. Other than a period of 10 days in February 2017 (i.e., prior to the Relevant Period)—in which Dean *lost* $637.50 trading binary options on forex contracts—there was never any trading activity in the account. (Compl. ¶ 42.)

**C.     Defendants' Purported Trading Profits**

30.     Defendants also made numerous representations to customers about their supposed trading profits. (Compl. ¶ 43.)

31.     For instance, on July 9, 2017, Dean posted a Facebook message to TEH Managed Accounts purporting to disclose trading "results [for] the last few weeks" of that program, boasting of "a few awesome weeks" and promising to "get even better." Included in the post was an image promoting weekly profits of 28.50%, 15.25%, and 19.50% for the first three weeks of the "TEH Managed Account" program, respectively; instructing customers to "Email for withdraw @ stockgains9@gmail.com"; and stating, "All money month withdrawn [sic] is compounded weekly." (Compl. ¶ 44.)

32.     On July 15, 2017, Dean posted a Facebook message to TEH Managed Accounts, stating: "17.6% this week. (for members) Was a good week but was really busy and was not able to trade as much as usual. Next week I got my sights set on 30%." Included in the post was

7

a purported "screenshot" showing trading from "last week," consisting of an image showing certain details (mostly illegible)—including order number, time, type (buy/sell), product (e.g., "BrentCrude")—of twenty-five purported trades.  (Compl. ¶ 45.)

33.  On July 23, 2017, Dean posted a Facebook message to TEH Managed Accounts, stating:  "15% last week.  Also waiting to close more trades from last week that will be added to this %.  $$$$$."  (Compl. ¶ 46.)

34.  On July 29, 2017, Dean posted a Facebook message to TEH Managed Accounts, stating:  "Waiting on a huge trade on OIL.  This week will be recorded next week after oil and a few other trades are closed.  This week will be just like the previous time we had to wait on trades to close.  Thanks!  Patience = money."  The post included an image containing an unlabeled graphic that was illegible except for the handwritten phrase "massive profit."  (Compl. ¶ 47.)

35.  On August 8, Dean posted to the Facebook Group an image showing purported profitable results trading forex and crude oil derivatives on that date, along with the message "Just keep pumping away . . . with Propht Taurai Moyo."  (Compl. ¶ 48.)

36.  On August 13, Dean posted a Facebook message to TEH Managed Accounts, purporting to provide "the managed account weekly results for the past 8 weeks."  Dean's message reiterated the percentages provided in his July 9, 15, and 23 messages for Week 1 through Week 5, and represented that total profits for "Week 6-8 (3 weeks)" were "41.25%." (Compl. ¶ 49.)

37.  On August 20, Dean posted a Facebook message to TEH Managed Accounts, stating:  "11% this week… slow week trying to get our site back up and running."  (Compl. ¶ 50.)

38.     All of these purported trading profits were entirely fictitious, as Defendants were not actually engaged in trading on behalf of their customers during the Relevant Period.  (Compl. ¶ 51.)

**D.     Solicitation and Transfer of Customer Funds in Bitcoin**

39.     As explained on Defendants' website, Defendants only accepted investor deposits in Bitcoin.  (Compl. ¶ 52.)

40.     Defendants instructed customers to set up personal account pages at the TEH website (referred to by Defendants and customers as their "back office") and follow the instructions there to transfer Bitcoin to TEH from the customers' own cryptocurrency wallets. (Compl. ¶ 53.)

41.     For instance, one customer who began investing with TEH in June 2017 ("Customer 2") was prompted by the TEH website to select one of three investment options (which varied by amount required to be invested, length of time of the investment, and promised rate of return).  (Compl. ¶ 54.)

42.     After Customer 2 selected the "Weekly VIP Plan," the TEH website provided him with an alphanumeric string to which to direct his payment of Bitcoin.  (Compl. ¶ 55.)

43.     Customer 2 then logged into his own Bitcoin wallet at Coinbase and directed Bitcoin to be paid from his wallet to the alphanumeric string provided by the TEH website. (Compl. ¶ 56.)

44.     Customer 2 later received a confirmation email from CoinPayments.net, a cryptocurrency payment processor used by TEH, stating that he had successfully directed payment of Bitcoins to "The Entrepreneurs Headquarters."  (Compl. ¶ 57.)

45.     After customers such as Customer 2 transferred Bitcoin to TEH through CoinPayments.net and the payments were confirmed, they could log into their back office and see their account balance with TEH, denominated in U.S. dollars.  (Compl. ¶ 58.)

46.     For a period of time, Defendants made upwards adjustments to customers' back office U.S. dollar account balances on a regular basis, reflecting the high rates of return ("11%-17.5%" per week, or comparable daily rates) promised on Defendants' website.  (Compl. ¶ 59.)

47.     As promised on the TEH website ("Profits can be withdrawn at anytime [sic]"), customers were initially able to withdraw the interest on their principal investments by logging into their back office and requesting the transfer of Bitcoin (corresponding to the U.S. dollar amounts shown in their back office) from TEH to the customers' Bitcoin wallets.  (Compl. ¶ 60.)

48.     Between approximately April 2017 and August 2017, many customers made successful withdrawals of Bitcoin from their accounts.  (Compl. ¶ 61.)

**E.     Defendants' Invention of a Hacking Incident in Order To Perpetuate Their Fraud**

49.     On August 9, 2017, a TEH customer whom Dean had added as an administrator of the Facebook Group on or about June 6, 2017 ("Administrator 2"), posted, while located in this District, a message to the Facebook Group that stated:

> URGENT MESSAGE..IT HAS BEEN BROUGHT TO OUR
> ATTENTION THAT SOME HAVE HAD THERE [sic]
> ACCOUNT HACKED AND WALLET CHANGED…ASAP GO
> CHANGE YOUR WALLET ADDRESS AND SAVE PLUS
> ENABLE ALL SECURITY[.]  IF YOU HAVE A PENDING
> WITHDRAW [sic] DOUBLE CHECK THE ADDRESS IT'S
> GOING TOO!!! [sic]  AND CHANGE YOUR EXSISTING [sic]
> PASSWORD AS WELL!!!!!"

(Compl. ¶ 62.)

50.     Later on August 9, Dean posted a message to the Facebook Group, stating:

"CRAZY I detected a hacker, but everything is ok, and I have stopped who ever it was.  I have

hared [sic] that some accounts got hacked, if they did, message me and I can fix the issue.  If you

need to send me a message, send a fried [sic] request first if your [sic] not friends so the message

goes to my primary inbox."  (Compl. ¶ 63.)

51.     There had been no hack of the TEH website, and Defendants knew, or recklessly

disregarded the fact, that at the time they made each of these statements about the supposed hack

the statements were false.  (Compl. ¶ 64.)

52.     The statements about the supposed hack were made by Defendants with the intent

to deceive customers and conceal and perpetuate Defendants' fraud.  (Compl. ¶ 65.)

53.     On August 11, Dean posted a message to the Facebook Group identifying a

"[s]uspicious email address" and stating:  "Do not respond to any emails from this guy . . . got to

say the hacker is really trying his hardest lol."

54.     Later on August 11, Dean posted another message to the Facebook Group, stating:

"Hacker is holding site for ransom LOL Do not touch the site I got an email titled 'i hacked you'

and requesting reply and most likly [sic] funds for him to release back to me."  (Compl. ¶ 67.)

55.     Dean knew that the person with the supposedly suspicious email address had not

hacked the TEH website, and that no one was holding the site "for ransom."  (Compl. ¶ 68.)

56.     Dean's message continued:  "Good thing I already have new site made!  Just am

finishing the back end and with programmers now to speed up the process."  Dean provided a

website address—http://dutysquad.com/demo/teh/index.php (the "preview website")—which, he

wrote, "is what the new site will look like!"  In fact, this "new" preview website had been online

11

since at least May 2017, and it contained substantially the same material as the purportedly hacked TEH website. (Compl. ¶ 69.)

57. Dean's message concluded by promising to provide "further instructions on how we will transfer to this site" and instructing customers to email him at stockgains9@gmail.com if they wished to make "any emergency withdraws [sic]" of funds. (Compl. ¶ 70.)

58. On August 13, Dean posted another message to the Facebook Group, stating: "Soon I will be collecting everyone's deposit amount and adding it to the new site when the programmer has it ready. Just finishing the new back end." (Compl. ¶ 71.)

59. Later on August 13, Dean posted another message, stating that Defendants were "[w]orking hard on finishing the back end" of TEH's new website "so we can start the transfer." (Compl. ¶ 72.)

60. Dean's message continued: "Money is safe and there are no problems." He concluded: "Apologize if I have not got to your message yet as I have 100s to go through." (Compl. ¶ 73.)

61. On August 14, Dean posted a message to the Facebook Group, claiming to have "processed over 100 emergency withdraws now," and asking customers to "please only do one if you really need it . . . the new site will be out soon." (Compl. ¶ 74.)

62. On August 17, Dean posted a message to the Facebook Group, stating: "All the data has been lost because of the hacker," and providing the following instructions to customers: "1) Send screenshots of your initial deposits into TEH from your wallet. 2) Send screenshots of all your withdraws made. 3) Send all screenshots here; --------→ transfertonewsite@gmail.com." (Compl. ¶ 75.)

63. Defendants then proceeded to post to the preview website a series of "Updates," which were merely attempts to continue to conceal their fraud by fabricating purported reasons for customers to delay taking action with respect to their investments. (Compl. ¶ 76.)

64. Defendants claimed on the preview website that as of August 19, 2017, they were "currently in the process of building the new site," and that, as of August 21, the "completion of the TEH back end will be 8/22/2017 (tomorrow)," stating: "The time estimation of creating each account accordingly is 2-3 days. After that the site will be ready and open for business." (Compl. ¶ 77.)

65. On August 21, Defendants posted a message to the preview website claiming that they were "[c]ompleting the payment software needed to do the payments." (Compl. ¶ 78.)

66. On August 23, Defendants posted a message to the preview website claiming that they were "[w]orking as fast has [sic] we can so we can start the adding everyone accounts [sic]" as well as "working on editing and re-doing the content of the site." The message stated that the "re-opening of the site will be between 8/26/2017-8/28/2017," i.e., within the next three to five days, "if everything goes according to plan." (Compl. ¶ 79.)

67. On September 2, Dean posted a message to the Facebook Group, stating that Defendants "will first find out what your active balance was before the site sent [sic] down." Dean promised that "[t]o cover the loss" from the time the original TEH website was down (and Defendants "were not able to trade as much"), "we will send you 18% of you active deposit PLUS adding the active deposit back onto a fresh new plan which will extend your earning days of the time we were down [sic]." (Compl. ¶ 80.)

68. In or around early September 2017, customers who had provided their information pursuant to Dean's August 17 instructions received emails from TEH using the

address transfertonewsite@gmail.com, which purported to have credited the customers with their "active balance" plus eighteen percent because "[d]uring our down period, we were only trading about half the time due to site maintenance."  The emails stated that TEH's new website "is not fully active" but promised to provide a link to the website "soon."  (Compl. ¶ 81.)

**F.      Defendants' Misappropriation and Refusal To Return Customers' Funds**

69.     As Defendants attempted to delay, customers began to post messages to the Facebook Group that were critical of TEH and Dean, questioning the validity of their representations and promises.  (Compl. ¶ 82.)

70.     In response, Dean and other administrators removed such customers from the group, and ultimately Defendants moved their activity to a new closed Facebook group, called "Official Entrepreneurs Headquarters Group" (the "'Official' Facebook Group").  (Compl. ¶ 83.)

71.     Ultimately, when Defendants provided the URL to TEH's new website, located at entrepreneursheadquarter.com, it contained substantially the same information as had already existed for months both on the original TEH website (theentrepreneurheadquarters.com) and the preview website.  (Compl. ¶ 84.)

72.     However, the extravagant daily and weekly returns promised to customers were reduced to almost zero.  Defendants offered no justification why their purported trading lost profitability so precipitously.  (Compl. ¶ 85.)

73.     In response to customers' requests for the return of their principal investments or purported earnings or fees that Defendants had represented to have been credited to their accounts, Defendants continued to make up excuses for their failure to pay redemptions.  (Compl. ¶ 86.)

74.     For instance, on December 9, 2017, Dean posted a message on the "Official"

Facebook Group, stating: "Withdraws; SLOWWW blockchain…btc was losing it there for a

while lol I am waiting on a few large transactions to be moved over into our BTC wallet for the

mass payment for everyone's withdraws." (Compl. ¶ 87.)

75.     When customers asked Defendants for the return of their funds, their requests

were ignored. (Compl. ¶ 88.)

76.     Dean stopped responding to emails and other communications from customers

who have previously asked for the return of their funds. (Compl. ¶ 89.)

77.     At least 127 customers of TEH have had their principal investments, totaling at

least $499,264.04, misappropriated by Defendants. Of those 127 customers, 120 customers who

have not received repayment of their full principal invested a total of $496,119.86, and received

back a total of $63,935.07, equivalent to a total principal loss of $432,184.79. (Decl. of

Christopher Giglio at ¶ 8.)

78.     Meanwhile, Dean and other representatives of TEH launched another purported

trading venture, Real Trade Profits ("RTP"), which solicited new customers in a manner very

similar to TEH—seeking investments in Bitcoin for a pooled investment, professing expertise

and consistent results in binary options trading, and promising high rates of return—using the

website realtradeprofits.com. (Compl. ¶ 91.)

79.     According to its website during the Relevant Period, RTP is a "small group of

self-taught traders who have developed two successful and unique trading techniques," who are

"Experts on the Binary Options and Forex Platforms." (Compl. ¶ 92.)

80.     The RTP website stated: "We have a [sic] automated payment platform that will

automatically pay interest on all of your deposits into RTP. Simply deposit and earn 20%-50%

of all the profits we make that day which averages 1-10% return on your money everyday [sic]

of the week . . . .  Your principal is returned to you at the end of the pay period, and you are able

to withdraw all profits as well." The website offers 14-day, 30-day, and 45-day "Interest Plans."

(Compl. ¶ 93.)

       81.     As of December 4, 2017, RTP purported to have 65 members.  (Compl. ¶ 94.)

## III.    CONCLUSIONS OF LAW

**A.**    **Jurisdiction and Venue**

      1.     Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a) (2012), authorizes the Commission

to seek injunctive and other relief in United States district court against any person whenever it

shall appear to the Commission that such person has engaged, is engaging, or is about to engage

in any act or practice constituting a violation of any provision of the Act, or any rule, regulation,

or order thereunder, and provides that district courts "shall have jurisdiction to entertain such

actions."  This Court also has jurisdiction over this case pursuant to 28 U.S.C. § 1331 (2012)

(federal question) and 28 U.S.C. § 1345 (2012) (United States as Plaintiff).

      2.     Venue lies properly with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C.

§ 13a-1(e) (2012), because Defendants transacted business in this District, and certain

transactions, acts, practices, and courses of business described above occurred in this District.

**B.**    **Defendants Committed Options Fraud in Violation**
        **of 7 U.S.C. § 6c(b) and 17 C.F.R. § 32.4**

      3.     Section 4c(b) of the Act, 7 U.S.C. § 6c(b) (2012), makes it unlawful for any

person to offer to enter into, enter into, or confirm the execution of, any transaction involving

any commodity regulated under the Act which is of the character of, or is commonly known to

the trade as, inter alia, an "option", "bid", "offer", "put", or "call", contrary to any rule,

regulation, or order of the Commission prohibiting any such transaction or allowing any such transaction under such terms and conditions as the Commission shall prescribe.

4.   Regulation 32.4, 17 C.F.R. § 32.4 (2017), provides that, in or in connection with an offer to enter into, the entry into, or the confirmation of the execution of, any commodity option transaction, it shall be unlawful for any person, directly or indirectly:  (a) to cheat or defraud or attempt to cheat or defraud any other person; (b) to make or cause to be made to any other person any false report or statement thereof or cause to be entered for any person any false record thereof; or (c) to deceive or attempt to deceive any other person by any means whatsoever.

5.   Defendants violated 7 U.S.C. § 6c(b) and 17 C.F.R. § 32.4, by, as described above, cheating and defrauding, or attempting to cheat and defraud, customers, in connection with Defendants' offers to enter into commodity option contracts.  Defendants misrepresented that they would trade binary options on Nadex and that customers would achieve returns of 11%-17.5% per week.  Defendants also misappropriated customer funds and never traded options with TEH customer funds.  Moreover, Defendants failed to disclose the high degree of risk associated with options trading and that it was possible to sustain a total loss of investment. Defendants also concealed and perpetuated their fraud by falsely stating that their website was hacked.

6.   Dean held and exercised direct and indirect control over TEH and either did not act in good faith or knowingly induced TEH's violations of 7 U.S.C. § 6c(b) and 17 C.F.R. § 32.4.  As a controlling person of TEH, Dean is liable for TEH's violations of 7 U.S.C. § 6c(b) and 17 C.F.R. § 32.4, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2012).

**C.     Defendants Committed CPO Fraud in Violation of 7 U.S.C. § 6o(1)**

7.     During the Relevant Period, TEH acted as a commodity pool operator ("CPO"),

as defined by Section 1a(11) of the Act, 7 U.S.C. § 1a(11) (2012), in that it engaged in a business

that is of the nature of an investment trust, syndicate, or similar form of enterprise, operated for

the purpose of trading in commodity interests and, in connection therewith, solicited, accepted,

or received from others, funds, securities, or property (in the form of Bitcoins), either directly or

through capital contributions, the sale of stock or other forms of securities, or otherwise, for the

purpose of trading in commodity interests, including, in relevant part, commodity options

authorized under Section 4c of the Act.

8.     An associated person ("AP") of a CPO is defined by Regulation 1.3(aa)(3), 17

C.F.R. § 1.3(aa)(3) (2017), as any person who is associated with a CPO as a partner, officer,

employee, consultant, or agent (or any natural person occupying a similar status or performing

similar functions), in any capacity which involves (i) the solicitation of funds, securities, or

property for a participation in a commodity pool or (ii) the supervision of any person or persons

so engaged.  During the Relevant Period, Dean acted as an AP of TEH, in that he solicited funds,

securities, or property (in the form of Bitcoins) for TEH's pool and supervised other officers,

employees, and agents of TEH who solicited funds, securities, or property for TEH's pool.

9.     Section 4o(1) of the Act, 7 U.S.C. § 6o(1) (2012), prohibits CPOs and APs of

CPOs, whether registered with the Commission or not, by use of the mails or any means or

instrumentality of interstate commerce, directly or indirectly, from employing devices, schemes,

or artifices to defraud any client or participant or prospective client or participant, or engaging in

transactions, practices, or courses of business which operate as a fraud or deceit upon any client

or participant or prospective client or participant.

10.     While acting in its capacity as a CPO and using the mails or any means or instrumentality of interstate commerce, TEH, by and through its officers, employees, and agents, knowingly or recklessly:  (1) misrepresented to customers that approximately forty percent of their funds would be pooled and used to invest in, among other things, commodity options contracts for the benefit of customers; (2) misrepresented to customers that Defendants had prior experience and success trading commodity options on Nadex; (3) misrepresented to customers that Defendants were using their funds to trade commodity options on Nadex and were doing so profitably; (4) mispresented to customers that Defendants were holding approximately sixty percent of their funds in reserve in order to facilitate withdrawals; (5) misrepresented to customers that the hacking of TEH's website and related issues were preventing Defendants from making customer funds available to customers; and (6) misappropriated pool participants' funds for unauthorized purposes rather than investing for the benefit of participants, and failed to disclose that pool participants' funds had been misappropriated.  Therefore, TEH violated 7 U.S.C. § 6o(1).

11.     Dean directly violated 7 U.S.C. § 6o(1) while acting in his capacity as an AP of THE and using the mails or any means or instrumentality of interstate commerce, because he knowingly or recklessly:  (1) misrepresented to customers that approximately forty percent of their funds would be pooled and used to invest in, among other things, commodity options contracts for the benefit of customers; (2) misrepresented to customers that Defendants had prior experience and success trading commodity options on Nadex; (3) misrepresented to customers that Defendants were using their funds to trade commodity options on Nadex and were doing so profitably; (4) mispresented to customers that Defendants were holding approximately sixty percent of their funds in reserve in order to facilitate withdrawals; (5) mispresented to

19

customers that the hacking of TEH's website and related issues were preventing Defendants

from making customer funds available to customers; and (6) misappropriated pool participants'

funds for unauthorized purposes rather than investing for the benefit of participants, and failed to

disclose that pool participants' funds had been misappropriated.

12.     Dean held and exercised direct and indirect control over TEH and either did not

act in good faith or knowingly induced TEH's violations of 7 U.S.C. § 6o(1).  As a controlling

person of TEH, Dean is liable for TEH's violations of 7 U.S.C. § 6o(1), pursuant to 7 U.S.C.

§ 13c(b).

**D.     Defendants Failed To Register as a CPO and as an AP of the CPO
in Violation of 7 U.S.C. §§ 6k(2) and 6m(1) and 17 C.F.R. § 3.12(a)**

13.     During the Relevant Period, TEH, while using the mails or means of interstate

commerce in connection with its business as a CPO, was not registered with the Commission as

a CPO and was not exempt from registration as a CPO.  Thus, TEH acted as an unregistered

CPO in violation of Section 4m(1) of the Act, 7 U.S.C. § 6m(1) (2012).

14.     During the Relevant Period, Dean, while acting as an AP of TEH, was never

registered as an AP of TEH.  Thus, Dean violated Section 4k(2) of the Act, 7 U.S.C. § 6k(2)

(2012), and Regulation 3.12(a), 17 C.F.R. § 3.12(a) (2017), by acting as an unregistered AP of a

CPO.

15.     Dean held and exercised direct and indirect control over TEH and either did not

act in good faith or knowingly induced TEH's violations of 7 U.S.C. § 6m(1).  As a controlling

person of TEH, Dean is liable for TEH's violations of 7 U.S.C. § 6m(1), pursuant to 7 U.S.C.

§ 13c(b).

## IV.   PERMANENT INJUNCTION

**IT IS HEREBY ORDERED THAT:**

1.      Dean and any person or entity in active concert with Dean are permanently restrained, enjoined and prohibited from engaging in conduct in violation of Sections 4c(b), 4k(2), 4m(1), and 4o(1)(A)-(B) of the Act, 7 U.S.C. §§ 6c(b), 6k(2), 6m(1), 6o(1)(A)-(B) (2012), and Regulations 3.12(a) and 32.4, 17 C.F.R. §§ 3.12(a), 32.4 (2017);

2.      TEH and any person or entity in active concert with TEH are permanently restrained, enjoined and prohibited from engaging in conduct in violation of 7 U.S.C. §§ 6c(b), 6m(1), 6o(1)(A)-(B), and 17 C.F.R. § 32.4;

3.      Defendants and any person or entity in active concert with Defendants are permanently restrained, enjoined and prohibited from, directly or indirectly:

     a.      Trading on or subject to the rules of any registered entity (as that term is defined by Section 1a(40) of the Act, 7 U.S.C. § 1a(40) (2012));

     b.      Entering into any transactions involving "commodity interests" (as that term is defined in Regulation 1.3(yy), 17 C.F.R. § 1.3(yy) (2017)), for accounts held in the name of any Defendant or for accounts in which any Defendant has a direct or indirect interest;

     c.      Having any commodity interests traded on any Defendant's behalf;

     d.      Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests;

     e.      Soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling of any commodity interests;

f.      Applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2017); and

g.      Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2017)), agent, or any other officer or employee of any person registered, exempted from registration, or required to be registered with the Commission except as provided for in Regulation 4.14(a)(9).

## V.      RESTITUTION AND CIVIL MONETARY PENALTY

**IT IS FURTHER ORDERED THAT:**

**A.      Restitution**

1.      Pursuant to Section 6c(d)(3)(A) of the CEA, 7 U.S.C. § 13a-1(d)(3)(A) (2012), Dean and TEH shall pay, jointly and severally, restitution in the amount of four hundred thirty-two thousand one hundred eighty-four dollars and seventy-nine cents ($432,184.79) (the "Restitution Obligation"), plus post-judgment interest, within ten (10) days of the date of the entry of this Order and Default Judgment (this "Order"). Post-judgment interest shall accrue on the Restitution Obligation beginning on the date of entry of this Order and shall be determined by using the Treasury Bill rate prevailing on the date of entry of this Order pursuant to 28 U.S.C. § 1961.

2.      To effect payment of the Restitution Obligation and the distribution of any restitution payments to Defendants' customers, the Court appoints the National Futures Association ("NFA") as Monitor ("Monitor"). The Monitor shall collect restitution payments from Defendants and make distributions as set forth below. Because the Monitor is acting as an

22

officer of this Court in performing these services, NFA shall not be liable for any action or inaction arising from NFA's appointment as Monitor, other than actions involving fraud.

3.       Defendants shall make Restitution Obligation payments under this Order to the Monitor in the name "Dillon Michael Dean and The Entrepreneurs Headquarters Limited – RESTITUTION Fund" and shall send such Restitution Obligation payments by electronic funds transfer, or by U.S. postal money order, certified check, bank cashier's check, or bank money order, to the Office of Administration, National Futures Association, 300 South Riverside Plaza, Suite 1800, Chicago, Illinois 60606 under cover letter that identifies the paying Defendant and the name and docket number of this proceeding.  Defendants shall simultaneously transmit copies of the cover letter and the form of payment to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.

4.       The Monitor shall oversee the Restitution Obligation and shall have the discretion to determine the manner of distribution of such funds in an equitable fashion to Defendants' customers identified by the Commission or may defer distribution until such time as the Monitor deems appropriate.  In the event that the amount of Restitution Obligation payments to the Monitor are of a de minimis nature such that the Monitor determines that the administrative cost of making a distribution to eligible customers is impractical, the Monitor may, in its discretion, treat such restitution payments as civil monetary penalty payments, which the Monitor shall forward to the Commission following the instructions for civil monetary penalty payments set forth in Part B below.

5.       Defendants shall cooperate with the Monitor as appropriate to provide such information as the Monitor deems necessary and appropriate to identify Defendants' customers

to whom the Monitor, in its sole discretion, may determine to include in any plan for distribution of any Restitution Obligation payments. Defendants shall execute any documents necessary to release funds that they have in any repository, bank, investment or other financial institution, wherever located, in order to make partial or total payment toward the Restitution Obligation.

6. The Monitor shall provide the Commission at the beginning of each calendar year with a report detailing the disbursement of funds to Defendants' customers during the previous year. The Monitor shall transmit this report under a cover letter that identifies the name and docket number of this proceeding to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.

7. The amounts payable to each customer shall not limit the ability of any customer from proving that a greater amount is owed from Defendants or any other person or entity, and nothing herein shall be construed in any way to limit or abridge the rights of any customer that exist under state or common law.

8. Pursuant to FRCP 71, each customer of Defendants who suffered a loss is explicitly made an intended third-party beneficiary of this Order and may seek to enforce obedience of this Order to obtain satisfaction of any portion of the restitution that has not been paid by Defendants to ensure continued compliance with any provision of this Order and to hold Defendants in contempt for any violations of any provision of this Order.

9. To the extent that any funds accrue to the U.S. Treasury for satisfaction of Defendants' Restitution Obligation, such funds shall be transferred to the Monitor for disbursement in accordance with the procedures set forth above.

**B.      Civil Monetary Penalty**

10.      Pursuant to Section 6c(d)(1)(A) of the CEA, 7 U.S.C. § 13a-1(d)(1)(A) (2012),

Dean and TEH shall, jointly and severally, pay a civil monetary penalty in the amount of one

million four hundred ninety-seven thousand seven hundred ninety-two dollars and twelve cents

($1,497,792.12) (the "CMP Obligation"), which is equivalent to triple the monetary gain to

Defendants from their violations—i.e., three times the gross amount of customer funds obtained

by Defendants that Defendants used for their own benefit or for the benefit of the fraud,

according to responses to a customer survey conducted by Plaintiff's counsel.  Defendants shall

pay the CMP Obligation within ten (10) days of the date of the entry of this Order.  If the CMP

Obligation is not paid in full within ten (10) days of the date of entry of this Order, then post-

judgment interest shall accrue on the CMP Obligation beginning on the date of entry of this

Order and shall be determined by using the Treasury Bill rate prevailing on the date of entry of

this Order pursuant to 28 U.S.C. § 1961.  Defendants shall pay their CMP Obligation by

electronic funds transfer, U.S. postal money order, certified check, bank cashier's check, or bank

money order.  If payment is to be made other than by electronic funds transfer, then the payment

shall be made payable to the Commodity Futures Trading Commission and sent to the address

below:

> MMAC/ESC/AMK326
> Commodity Futures Trading Commission
> Division of Enforcement
> 6500 S. MacArthur Blvd.
> Oklahoma City, OK 73169
> (405) 954-6569 office
> (405) 954-1620 fax
> 9-AMC-AR-CFTC@faa.gov

If payment by electronic funds transfer is chosen, Defendants shall contact Marie Thorne or her

successor at the address above to receive payment instructions and shall fully comply with those

instructions. Defendants shall accompany payment of the CMP Obligation with a cover letter that identifies the paying Defendant and the name and docket number of this proceeding. Defendants shall simultaneously transmit copies of the cover letter and the form of payment to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.

## VI.    MISCELLANEOUS PROVISIONS

**IT IS FURTHER ORDERED THAT:**

1.    Acceptance by the Commission or the Monitor of any partial payment of Defendants' Restitution Obligation or CMP Obligation shall not be deemed a waiver of their obligation to make further payments pursuant to this Order, or a waiver of the Commission's right to seek to compel payment of any remaining balance.

2.    The injunctive and equitable relief provisions of this Order shall be binding upon Defendants, upon any person under the authority or control of any Defendant, and upon any person who receives actual notice of this Order, by personal service, email, facsimile or otherwise insofar as he or she is acting in active concert or participation with Defendants.

3.    All notices required to be given by any provision in this Order shall be sent certified mail, return receipt requested, as follows:

Notice to Commission:

Manal M. Sultan
Deputy Director
Division of Enforcement
Commodity Futures Trading Commission
140 Broadway, 19th Floor
New York, NY 10005

Notice to Monitor:

Daniel Driscoll
Executive Vice President, COO
National Futures Association
300 South Riverside Plaza, Suite 1800
Chicago, Illinois 60606-3447

All such notices to the Commission or the Monitor shall reference the name and docket number

of this action.

4.      Until such time as Defendants satisfy in full their Restitution Obligation and CMP

Obligation as set forth in this Order, Defendants shall provide written notice to the Commission

by certified mail of any change to their telephone number and mailing address within ten (10)

calendar days of the change.

5.      If any provision of this Order or if the application of any provision or

circumstance is held invalid, then the remainder of this Order and the application of the provision

to any other person or circumstance shall not be affected by the holding.

## VII.    CONTINUING JURISDICTION OF THIS COURT

IT IS FURTHER ORDERED THAT:

This Court shall retain jurisdiction of this action to ensure compliance with this Order and

for all other purposes related to this action, including any motion by Defendants to modify, or for

relief from, the terms of this Order.

**IT IS SO ORDERED.**

Date: _July 9,_____, 2018

s/ Sandra J. Feuerstein
_____
Sandra J. Feuerstein
United States District Judge